**Horst NEMETZ, Appellant,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Appellee.**

**In re Petition for Naturalization of Horst NEMETZ.**

**No. 80–1289.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1980.

Decided April 24, 1981.

Richard Murray, Washington, D. C. (Pompan, Jaffe & Murray, Washington, D. C., Carolyn S. Motes, Fairfax, Va., Irving Jaffe, Alan J. Ross, Washington, D. C., on brief), for appellant.

Margaret J. Perry, Dept. of Justice, Washington, D. C. (James P. Morris, Dept. of Justice, Washington, D. C., on brief), for appellee.

Before WINTER, SPROUSE and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

In this appeal, Horst Nemetz seeks reversal of the district court's denial of his petition for naturalization. 485 F.Supp. 470. For reasons stated below, we grant that reversal.

I.

Nemetz, a forty-one year old citizen of West Germany, was lawfully admitted to the United States in 1967 as a permanent resident and has resided since that time in Virginia with a male roommate.

In 1976, Nemetz petitioned for naturalization. Although it is unclear from the record exactly how or when the Immigration and Naturalization Service (hereafter, the "Service") first became aware of Nemetz's homosexuality, at the Service hearings on his petition, he was questioned extensively about his homosexual activity:

Q. Mr. Nemetz, are you now or have you ever been a homosexual?

A. I'm now.

Q. You are now?

A. Yes.

. . . .

Q. But you have and you so testified at this time dated women in Germany before you came to the United States?

A. Yes.

Q. Do you have sexual relations with your roommate . . . ?

A. Well, we have a relationship. I like him.

Q. Have you ever had sexual relationships with him?

A. What do you mean sexual relationships?

Q. Intimate relationships. Getting into the sexual aspects.

Q. Either yes or no.

A. Yes.

. . . .

Q. Mr. Nemetz, have you ever committed a homosexual act in public?

A. No.

Q. Have you ever recruited for any type of sexual activities in public?

A. No.

Q. Or everything you state that you have done as far as your private life is concerned, sexual life has been private. Is that correct, sir?

A. Yes.

Q. And to this date you still are [a] practicing homosexual. Is that correct, sir?

A. Yes.

Q. Ok. Have you ever been arrested or been questioned by the police for any of these activities?

A. No.

Q. Any complaints made against you concerning these activities?

A. No.

. . . .

Q. So what you're saying is that your relationship in the United States has been with one individual. Is that correct?

A. Yes.

Q. And no others?

A. That's right. Yeah.

Q. And in your lifetime that is the only individual you've had a relationship of this type with?

A. Yes.

. . . .

Q. Ok, Mr. Nemetz. In the last six years have you had sexual relations with [your roommate]?

A. Yes.

Q. Alright[sic]. These sexual relations, were they oral type sexual relations?

A. No. Not particularly.

Q. Have there been any in the last six years?

A. I guess.

Q. Yes or no?

Mr. Murray: Can I ask a question?

Q. Yes.

Mr. Murray: Why is that particular question asked? I mean he has admitted to sexual relations.

Q. Well, ah, sex relations can be interpreted different ways and I don't want to get into, ah a linguistic battle of what sexual relations are at this point. There is [sic] either been penetration at one point or another, for sexual relations or sex relations at some point can be petting or kissing or things like that and inorder [sic] to further determine and interprete [sic] what exactly is meant by sexual relations, I'd like it specifically on the record.

Mr. Murray: But what I'd like to know is why this particular question when he has admitted to sex relations. What would be what's [sic] relevance to the proceeding?

Q. The relevance to the proceeding is a practicing homosexual whether it is would have a bearing on naturalization or not would be dependent on ah the type of activities that have ah gone that have gone before the activities that have gone with Mr. Nemetz and his roommate would have a bearing on depending on what the state law is concerning these activities.

(Transcript at 7–19).[1]

## II.

 The Immigration and Nationality Act requires that one seeking naturalization be of good moral character, *see* 8 U.S.C. § 1427(a), but precludes such a finding if the alien has "been convicted of a crime involving moral turpitude" or "admit[s] having committed such a crime [or] committing acts which constitute the essential elements of such a crime." 8 U.S.C. §§ 1101(f)(3), 1182(a)(9). The burden of

---

1. At oral argument the Service conceded that heterosexuals, whether married or unmarried, would not be subjected to questions concerning their private consensual sexual activities. As most states that proscribe consensual sodomy (including Virginia) make no distinction between homosexual and heterosexual acts, there appears to be no basis in law for treating the two classes differently.

proving good moral character under this section is on the alien. *See Berenyi v. District Director*, 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967).

In this case, the Service Examiner recommended that Nemetz be denied naturalization because Nemetz had not sustained his burden of proof on the good moral character issue. The district court agreed, finding that Nemetz had failed to rebut the inference that he had committed sodomy in violation of Virginia law, *see*, Va.Code § 18.2–361; this inference arose from Nemetz's admission that he had had homosexual relations with his roommate. Under the district court's analysis, Nemetz's failure to rebut that inference constituted a failure to meet his burden of proof on the issue of good moral character.

### III.

■ The issue here is whether the district court properly referred to the Virginia sodomy statute to determine whether Nemetz had committed a crime of moral turpitude,[2] that is, whether it is appropriate to look to state law to determine the issue of good moral character in naturalization matters.

Nemetz argues that the United States Constitution requires a "uniform rule of naturalization," U.S.Const. art. I, § 8, cl. 4. Because reference to state law yields differing results from state to state, he contends that it is improper to define "moral turpitude" in those terms.

We agree with Nemetz that whether a person is of good moral character for purposes of naturalization is a question of federal law. Development of a federal standard for making that determination provides the only certain means of creating the constitutionally required uniform rule; reference to laws which vary from state to state can only lead to differing and often inconsistent results. The circumstances of this case well illustrate how the concept of uniformity is destroyed when state law is allowed to control. At least nine states (Illinois, Connecticut, Oregon, Colorado, Hawaii, Delaware, Ohio, North Dakota and California) have decriminalized private, consensual sodomy between adults, and two state statutes prohibiting such activity between unmarried adults have recently been held unconstitutional. *See People v. Onofre*, 434 N.Y.S.2d 947, 51 N.Y.2d 476, 415 N.E.2d 936 (N.Y.1980); *Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47 (1980). At oral argument it was conceded that if Nemetz lived in Illinois, the Service would be unable to oppose his petition on the ground of bad moral character. In any state in which sodomy is not a crime, Nemetz could have freely admitted to committing acts of sodomy without placing his petition in jeopardy. In other words, but for an "accident of geography," Nemetz perhaps would be a naturalized citizen today. Such a result hardly contributes to any principle of uniformity and is, in fact, incongruous with common sense.

The Service maintains, however, that reference to state law is correct because Congress has traditionally deferred to the states to set standards in matters pertaining to public morality, and that the immigration laws contemplate such deference. This argument, however, overlooks the constitutional mandate of uniformity in the area of naturalization. While it is true that Congress has in the past allowed the states great latitude with respect to morality,[3] that latitude cannot be granted when the resulting inconsistencies undermine a uniform rule of naturalization. Such a practice would "permit[ ] state law to govern the creation of a relationship [citizenship] in which the state has no legitimate interest and over which Congress has exclusive authority, a result that is directly contrary to

---

**2.** The district court found that Nemetz "was never asked whether he had ever engaged in sexual acts constituting sodomy," Memorandum Opinion at 470, but nonetheless inferred from Nemetz's testimony that Nemetz had indeed committed sodomy. For purposes of this opinion, we assume without deciding that the inference was a proper one.

**3.** We point out that nothing in this opinion interferes with a state's right to set legislative standards of morality for its own purposes.

the one intended by the framers of the naturalization clause." Hertz, "Limits to the Naturalization Power," 64 *Geo.L.J.* 1007 (1976).

### IV.

In determining which crimes will preclude a finding of good moral character for naturalization purposes, federal courts can appropriately look to state law in the initial stages of the determination. When use of state law defeats the uniformity requirement, however, the court must devise a federal standard by other means. Resolution of most cases will not, as a practical matter, be problematic, for crimes against the public are treated fairly uniformly throughout the country, with differences for the most part being in degree rather than in kind.[4] In those cases, state law will be the best barometer of the conscience of the country as a whole.

The difficulty arises primarily with respect to private acts which are the subject of radically different legislative treatment by the states. While we can assume without harm to the outcome of this case that states have a legitimate interest in regulating private acts, the federal government has none for the purposes of the naturalization laws. *See Wadman v. INS*, 329 F.2d 812 (9th Cir. 1964). The appropriate test in such cases therefore is whether the act is harmful to the public or is offensive merely to a personal morality. *See In re Labady*, 326 F.Supp. 924 (S.D.N.Y.1971). Only those acts harmful to the public will be appropriate bars to a finding of good moral character under the scheme of § 1101(f)(3) and 1182(a)(9). Approached in that manner, naturalization cases will be capable of uniform resolution throughout the country, and the constitutional requirement will be met.

*Wadman v. INS*, 329 F.2d 812 (1964), in which the Ninth Circuit acknowledged the distinction between private and public acts for purposes of naturalization, is instructive here. In its efforts to define adultery within the meaning of 8 U.S.C. § 1101(f)(2),[5] the court implicitly recognized that it is the public rather than private aspect of adultery that makes it an act of moral turpitude:

> Congress has not said that fornication is sufficient to defeat good moral character. Congress has not found the fact of sexual intercourse unblessed by marriage to offend the common conscience; (at least, not to such a degree as to reflect upon the character of the offender). Rather it has found offensive that extramarital intercourse which tends to destroy an existing marriage; which evidences disregard of marital vows and responsibilities.

329 F.2d at 817.

■ A close reading of the Act, moreover, lends support to the view that Congress did not intend to bar a finding of good moral character merely because of an alien's private consensual sexual activities. Section 1182 excludes from the country thirty one general classes of aliens. Rather than making the categories for § 1182 exclusion and for a § 1101(f) finding of bad moral character coextensive, Congress in-

---

**4.** In *Castle v. INS*, 541 F.2d 1064 (4th Cir. 1976), for example, to which the Service points in support of its argument that this circuit has in fact referred to state law in moral turpitude cases, the court agreed that an alien convicted under Maryland law of carnal knowledge of a fifteen year old was deportable under the moral turpitude statute. The court did not look to state law alone (although conviction under the Maryland statute was clearly its starting point) but found that carnal knowledge "is so basically offensive to American ethics and accepted moral standards as to constitute moral turpitude *per se*." *Id.* at 1066. Without benefit of exhaustive research on the subject, we think it

would be fairly safe to say that carnal knowledge is a crime in all fifty states; even though specific elements of the crime may differ slightly from state to state, the conscience of the country as a whole with respect to carnal knowledge is evident. The same could be said for many other crimes against the public, e. g., murder, armed robbery, bigamy.

**5.** Adultery is one of several specifically enumerated acts that will bar a finding of good moral character under § 1101(f). *See* 8 U.S.C. § 1101(f)(2). Among others are habitual drunkenness, illegal gambling and murder. *See* 8 U.S.C. § 1101(f)(1), (4) and (8).

stead absolutely barred a finding of good moral character for only six of the § 1182 excludable classes:

(f) For purposes of this chapter—

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

. . . .

(3) a member of one or more of the classes of persons, whether excludable or not, described in paragraphs (11) [polygamists], (12) [prostitutes or procurers], and (31) [those offering aid for illegal entry, for gain] of section 1182(a) of this title; or paragraphs (9) [one who has committed a crime of moral turpitude], (10) [one convicted of two or more offenses resulting in more than a five year aggregate sentence] and (23) [illicit drug traffickers or possessors] of section 1182(a) of this title if the offense described therein . . . was committed during such period.

8 U.S.C. § 1101(f).

Not referred to in § 1101(f) is the excludable class of "[a]liens afflicted with . . . sexual deviation," 8 U.S.C. § 1182(a)(4), which has been interpreted to be available to exclude homosexuals. *See Boutilier v. INS,* 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967). Had Congress intended homosexual acts to evince bad moral character, it could easily have incorporated § 1182(a)(4) into § 1101(f) by reference, as it did with regard to other excludable classes. Its failure to do so leads us to the conclusion that it did not intend purely private sexual activities to act as an absolute bar to a finding of good moral character.

## V.

We now return to the case at hand. Under the foregoing analysis, Nemetz's homosexual activity cannot serve as the basis for a denial of a finding of good moral character because it has been purely private, consensual and without harm to the public: the district court's reliance on state law was, in this instance, legally incorrect.

The record indicates that Nemetz in all respects sustained his burden of proving good moral character: he testified that he has been steadily employed and earning a good income since his entry into the United States, and he submitted affidavits of witnesses that he had been a good businessman and friend.

There being nothing to support the district court's conclusion that Nemetz failed to meet his burden of proving good moral character, we reverse and remand for entry of an order granting the petition.

*REVERSED AND REMANDED.*