**UNITED STATES of America, Appellee,**

v.

**Mary Louise SEAY, a/k/a Mary Louise Derringer, Appellant.**

No. 81–5285.

United States Court of Appeals,
Fourth Circuit.

Argued June 8, 1983.

Decided Oct. 11, 1983.

John D. Delgado, Columbia, S.C. (J. Edward Bell, III, Sumter, S.C., on brief), for appellant.

Eric Wm. Ruschky, Asst. U.S. Atty., Columbia, S.C. (Henry Dargan McMaster, U.S. Atty., Columbia, S.C., on brief), for appellee.

Before HALL and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

CHAPMAN, Circuit Judge:

Mary Louise Seay, also known as Mary Louise Derringer, appeals her conviction on three counts of making false statements to the Department of Labor that she had not remarried since the death of her first husband (18 U.S.C. § 1001[1]) and on one count of knowingly accepting about $14,000 in Federal Employees Compensation Act (FECA) benefits that she was not entitled to receive because she had remarried. 18 U.S.C. § 1921.[2] On the three counts under

1. 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 1921 provides:

Whoever, being entitled to compensation under sections 8107–8113 and 8133 of title 5 and whose compensation by the terms of

§ 1001, which are felonies, she was sentenced to two years, suspended on service of six months with five years probation. She was also ordered to repay $13,261.92 in benefits.[3] For violation of § 1921, a misdemeanor, imposition of sentence was suspended and the appellant was placed on five years probation, to run concurrently with the probation on the three other counts. On appeal Mrs. Seay challenges the sufficiency of the evidence relating to her common law marriage. She also argues that her constitutional rights of due process under the fifth amendment were violated. We find, however, that the evidence was sufficient for the jury to find that Mrs. Seay had entered into a common law marriage under South Carolina law, that she knew she was married and that she filed the false statements that she had not remarried with the intent that the government act upon the misrepresentations. The jury also had sufficient evidence to conclude that the defendant accepted compensation after remarriage. Finding further that defendant's constitutional rights were not violated, we affirm the district court.

## I

The defendant became eligible for FECA benefits because of the death of her husband, Edward Derringer, in 1950 while he was an active duty reservist. After Derringer's death, his widow applied for and received benefit payments until they were terminated by the Department of Labor in March 1981.

Prior to the marriages of her children, the appellant received $189.45 per month, plus $165.77 per month on account of her four children.

In December 1962, defendant and her four children moved from their residence in Columbia, South Carolina to the home of Coke Seay, a widower, who lived in the nearby town of Lexington. The couple had sexual relations both before and after they began living together. Defendant testified that when she first moved in with Coke Seay she intended to marry him but later changed her mind. The two lived together in the same house until 1981 when Mrs. Seay moved out on the advice of her attorney. This was after the Department of Labor began its investigation into her marital status.

Approximately nine months before moving to Coke Seay's house, defendant signed the following handwritten statement that was presented to her by a Department of Labor agent:

> This is to advise that I, Mrs. Mary L. Derringer, residing at 3030 Park Street, Columbia, South Carolina, wish to state that I have not remarried, or entered into a common-law marital relationship.
>
> In addition to B.E. Compensation, my three children receive $67.40 Social Security and I receive $29.30 per month.
>
> I wish to continue the practice of having my check mailed to my Mother's address at 1115 Northwood Street, Columbia, South Carolina. (EV 492)

Mrs. Seay testified at trial that she asked the agent why he had come and whether he was making a periodic check. When he asked her to sign the statement she replied, "Yes, I will sign it, but I don't understand why that you are talking about common law, remarriage and all of that, because I have not entered into either one of them."

Shortly after the couple began living together, they transferred their church memberships from separate churches to the Providence Lutheran Church in Lexington. They joined this church as "Mr. and Mrs. Coke Seay" and appeared in the church pictorial directory as "Coke & Louise Seay." At trial the minister of Providence Lutheran Church testified that the church's members considered the couple to be married.

---

those sections stops or is reduced on his marriage or on the marriage of his dependent, accepts after such marriage any compensation or payment to which he is not entitled shall be fined not more than $2,000 or imprisoned not more than one year, or both.

3. The amount to be paid in restitution was the sum of the benefits received during the period within the statute of limitations.

The two were members of this church for approximately nineteen years, from 1962 until 1981 when the defendant transferred her membership back to the Park Street Baptist Church where she had previously been a member.

After she was first awarded compensation, appellant received a copy of a Department of Labor form dated November 3, 1953 entitled "Compensation Order Award of Compensation." Among the Findings of Fact were "[t]hat the claimant above named is entitled to compensation on her own account until she dies or remarries." Instructions that accompanied the Compensation Order provided that "[i]f, when a check reaches you, your status has changed through remarriage or otherwise . . . you should return the check immediately to this office accompanied by a full explanation of any change in the status of yourself."

Sometime shortly after July 4, 1966 defendant also received a "Notice to Payee" statement. It provided:

The Federal Employees' Compensation Act provides your right to compensation as a widow (or dependent widower) ceases when you remarry. Because of a recent amendment to the Compensation Act you may upon remarriage after July 4, 1966 receive a lump sum payment equal to 24 times the monthly compensation you are receiving for yourself.

You are required to promptly notify the Bureau when you remarry. Before the lump sum is paid the Bureau will require a copy of the public record of your remarriage which bears the certificate and seal of the custodian of the public marriage records. If practicable, it should be sent in with your notice of remarriage.

The convictions for filing false statements were based on Mrs. Seay's responses to questions on a form entitled Claim for the Continuance of Compensation. Appellant filled out this form, sent to her yearly by the Department of Labor, on July 1, 1977, May 6, 1978 and December 15, 1980. She answered the following question "no": Have you married since the death of the above named employee? Yes____ No____ If 'yes' complete 10." Question 10 was "[w]hen and where was the marriage performed and what was the change in name, if any?" The form provided additional space for answers to questions 10, 11 and 12. The following statement appeared beside the claimant's signature:

I declare under the penalties of perjury that the information contained on this form is true and correct: and that I will immediately notify the office of worker's compensation programs of any change in status.

After learning of the possibility of prosecution, Mrs. Seay brought a declaratory judgment action in Lexington County Family Court to have the marriage declared invalid. The decision of the family court that it lacked subject matter jurisdiction was affirmed by the South Carolina Supreme Court. *Derringer v. Seay*, S.C., 296 S.E.2d 341 (1982). The supreme court concluded that there was no justiciable controversy because both parties alleged that no valid marriage existed.[4]

## II

Defendant argues that the evidence of the marriage was insufficient as a matter of law and that the trial court erred in not granting a directed verdict of acquittal. Defendant contends that both parties explicitly denied being married, that Coke Seay never held himself out as being married, that reputation as to defendant's marital status was divided and that some members of the community had assumed that a marriage existed because of the cohabitation of the parties.

The South Carolina Supreme Court has recognized that a common law marriage may exist despite denials by the husband

4. The South Carolina Supreme Court also observed that, at the family court hearing, appellant and Coke Seay, who was the respondent, testified that they had never held themselves out to be married. This testimony was contradicted by witnesses for the prosecution in the trial of the instant case. It appears clear to us that the couple was in effect asking the family court to give an advisory opinion that they were not married.

and wife. In *Jeanes v. Jeanes,* 255 S.C. 161, 177 S.E.2d 537 (1970) Mr. Jeanes, who had agreed to pay alimony to his wife until she died or remarried, petitioned to have the payments terminated because his former wife had entered into a common law marriage. Both the former wife and Mr. Swygert, the man that she was living with, denied any intent to be married. The court found, however, that facts such as the cohabitation by the couple for over two years, city directory listings of the two as husband and wife, insurance records in which Mr. Swygert had given the woman's name as wife and beneficiary, a post office box rented by the woman under the name Mae Jeanes Swygert and tax returns in which Mr. Swygert listed the same post office box as his wife's address showed the requisite intent to be married notwithstanding the statements of the couple.

5. The defense introduced evidence of the following facts: (1) appellant and Coke Seay filed income tax returns as single persons under two different names (Seay and Derringer); (2) the couple maintained separate finances (although defendant conceded that she handled Coke Seay's finances for him); (3) defendant used the name Derringer in business transactions, in public records, and in the newspaper marriage announcements of her four children; (4) Coke Seay noted on a 1973 property transaction that he was a widower; and (5) at trial witnesses testified concerning instances in which the couple had denied being married to each other.

6. The government's evidence included the following facts: (1) In 1962 the couple joined the Providence Lutheran Church as Mr. and Mrs. Coke Seay and were listed as such in the church's pictorial directory. (2) The minister of Providence Lutheran Church testified that the church members accepted the couple as husband and wife. (3) The mailman who since 1959 had delivered mail in the area of appellant's former house and of her mother's house testified that he knew defendant as Mrs. Mary Louise Derringer Seay and that he had heard "from some of the neighbors and friends" that she had married and moved to Lexington. This mailman was also a member of the Park Street Baptist Church, appellant's church prior to her move to Lexington. (4) The mailman for the route including Coke Seay's house testified that he delivered mail of a personal nature ("Christmas cards, birthday cards, or just somebody writing to her") addressed to Mrs. Coke Seay, Route 7, Lexington, South Carolina and delivered business mail addressed to Mary Louise Derringer at the same address. (5) Jim Sprad-

At trial the defense presented evidence that at times Coke Seay and appellant had denied being married to each other and had acted in ways that indicated their intent to be single.[5] The government, however, introduced evidence of indicia of marriage including specific instances in which the couple had held themselves out as married.[6] Appellant does not argue that the trial court erred in instructing the jury concerning the prerequisites for a common law marriage in South Carolina. We find that, based on the record there was sufficient evidence for the jury to find beyond a reasonable doubt that appellant and Coke Seay had entered into a common law marriage.[7]

### III

The jury was also properly charged by the trial court concerning the elements

ley, the divorced husband of appellant's daughter, Melba, testified that Coke Seay was initially introduced to him as Melba's stepfather or as Melba's mother's husband. Spradley testified that he addressed appellant as Mrs. Seay and that once, when Melba and Jim Spradley were having an argument about defendant's marital status, appellant came to the Spradley house and told Jim Spradley that "yes, she was married" to Coke Seay. (6) In 1973 appellant signed "Louise Seay" on a renunciation of dower for a right-of-way easement involving property owned by Coke Seay. (7) The 1967 and 1968 city directories for Lexington listed "Mrs. Coke Seay" as the assistant manager of a local liquor store. Appellant testified that she worked in a Lexington liquor store two days a week for three weeks.

7. The inconsistency between presenting herself as Mrs. Derringer in her business transactions and as Mrs. Seay in matters of a more personal nature could have caused the jury to interpret appellant's actions as a deliberate attempt to conceal her relationship with Coke Seay in order not to lose the FECA benefits. For example, appellant requested that her FECA benefits checks be sent either to her mother's address (even after her mother's death) or to a post office box instead of having the check mailed to the house where appellant actually resided. At oral argument, defendant's attorney agreed that one interpretation of Mrs. Seay's actions could have been that she was concerned about concealing her status from the government but not necessarily from the community. It seems clear to us that this was the interpretation that the jury gave to her conduct.

of 18 U.S.C. § 1001. These elements are "the making (a) 'in any matter within the jurisdiction of any department or agency of the United States,' of (b) a false statement of (c) material fact with (d) fraudulent intent. *United States v. Race,* 632 F.2d 1114, 1116 (4th Cir.1980) (citations omitted). The jury was instructed:

First, the prosecution must prove beyond a reasonable doubt that the defendant made and used or caused to be made and used a false statement, writing or document as to a material fact in relation to a matter within the jurisdiction of a department or agency of the United States, as charged.

Secondly, that she did such act or acts knowing at that time that the writing or document was false or fictitious and fraudulent, as charged in each of these three counts of the indictment.

And third, that she did such act or acts knowingly and willfully as I have now defined those terms to you.

And again I say that all three of those elements as to those three offenses must be proved beyond a reasonable doubt.

The terms knowingly and willfully were defined by the trial court:

An act is done willfully if done voluntarily and intentionally, and with the specific intent to do something which the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

And the word knowingly is added in order to ensure that no defendant will be convicted in this court who made or caused to be made a statement or representation which was false, because of some mistake or accident or any other reason on the part of the defendant.

In his charge concerning common law marriage, the trial court indicated that in order to find her guilty, the jury needed to conclude that appellant knew she was married: "Under the common law of South Carolina in reference to these common law marriages, it is essential to a common law marriage that there shall be a mutual agreement and understanding between the parties to assume toward each other the relationship of husband and wife." The jury was also instructed that in order to have a common law marriage "there must be the intent. The intent in marriage consists of living together by agreement of a man and woman as husband and wife, according to what we know to be the law of this state and according to what we believe to be the law of God."

## IV

■ Defendant argues that her constitutional rights of due process under the fifth amendment were violated by her conviction. At the outset, it is important that we clearly define what is, and what is not, encompassed by this decision. Appellant speaks of "the general rationale opposing the maintaining of common law crimes," "the lack of specificity as to the proscribed conduct" and the limited right of incorporation of "state penal law." Mary Louise Seay was not convicted, however, of having entered into a common law marriage. Entering into a common law marriage is not a crime in South Carolina nor in the other seventeen states that recognize the doctrine. The crimes for which she was indicted, violations of 18 U.S.C. § 1001 and of 18 U.S.C. § 1921, could have been the basis for an indictment in all fifty states. The crime is that of making a false written statement as to a material fact to an agency or department of the United States.

There are thousands of different factual situations that citizens certify to various departments of the government every day. In some instances the false statement concerns something that in itself constitutes a crime. In many cases, however, as in the instant case, the criminal element is found exclusively in the misrepresentation or non-disclosure of a material fact. *See, e.g. United States v. Rose,* 570 F.2d 1358 (9th Cir.1978) (§ 1001 violation where defendant told customs officials that he was not returning from a trip abroad); *United States v. Gilbertson,* 588 F.2d 584 (8th Cir.1978) (false statement concerning ownership of grain stored in a grain elevator); *United*

*States v. London,* 550 F.2d 206 (5th Cir. 1977) (question of sufficiency of indictment; court found concealment of material fact where defendants failed to state in application for Farmers Home Administration loan that properties were encumbered with junior liens).

## V

Defendant contends that the principles and policies of this court's decision in *Nemetz v. Immigration and Naturalization Service,* 647 F.2d 432 (4th Cir.1981) are instructive in the instant case. We find, however, that significant differences outweigh the similarities between the two cases. In *Nemetz* the defendant was denied naturalization based on his failure to rebut the inference that he had committed sodomy in violation of Virginia law.[8] The court found that the constitutional requirement of uniformity in naturalization matters (U.S. Const. art. I, § 8, cl. 4) mandated that state criminal law not be relied on to define "good moral character" where inconsistent results would be reached in different states.

There is no constitutional mandate of uniformity with respect to 18 U.S.C. § 1001. Nor is there any compelling need for absolute uniformity such that only a ceremonial marriage may be accorded the

status of marriage by the Department of Labor. It is a well-established rule that a state has the power to determine how its residents enter into a marital relationship. *Maynard v. Hill,* 125 U.S. 190, 205, 8 S.Ct. 723, 726, 31 L.Ed. 654 (1887).[9] Variations in state law concerning the prerequisites to a valid marriage may work to the advantage of a resident. *See, e.g. Albina Engine and Machine Works v. J.J. O'Leary,* 328 F.2d 877 (9th Cir.1964) *cert. denied,* 379 U.S. 817, 85 S.Ct. 35, 13 L.Ed.2d 29 (claimant was "widow" of decedent because the two had entered into a nonceremonial marriage recognized by local law. The claimant was, therefore, entitled to receive death benefits under the Longshoreman's and Harbor Workers' Act); *Day v. Secretary of Health and Human Services,* 519 F.Supp. 872 (D.S. C.1981) (claimant found to have properly received Social Security benefits where a valid common law marriage existed between claimant and her retired "husband"); *Old Republic Insurance Company v. Christian,* 389 F.Supp. 335 (E.D.Tenn.1975) (woman was entitled to share in Tennessee workmen's compensation benefits arising out of work-related death of her common law husband where common law marriage was entered into in either Georgia or Alabama).[10]

---

8. As noted above, the instant case does not involve a state crime. State law is involved only with respect to the formalities requisite to a valid marriage within the state.

9. The Court described the state's role in defining a valid marriage:

Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution. 125 U.S. at 205, 8 S.Ct. at 726.

10. *Nemetz* is also distinguishable because the "accident of geography" criticism is not entirely applicable to the instant case. The *Nemetz* court noted that the Immigration and Naturalization Service would have been unable to oppose Nemetz' petition on the ground of bad

moral character in states in which sodomy was not a crime. The conclusion was that "but for an 'accident of geography,' Nemetz perhaps would be a naturalized citizen today." 647 F.2d at 435.

Defendant's statement that Mrs. Seay could not have been prosecuted in any of the other four states within the Fourth Circuit is not precisely correct. The general rule is that the validity of a marriage is determined by the law of the state with the most significant relationship to the spouses and the marriage and that a marriage valid where contracted is valid everywhere. *Restatement (Second) Conflicts of Laws* § 283 (1971). *See, e.g., Metropolitan Life Insurance Company v. Holding,* 293 F.Supp. 854 (E.D.Va.1968) (applying Virginia law; held that common law marriage, valid under either Florida or Ohio law, would be recognized by Virginia where parties were not forbidden to marry under Virginia law); *Goldin v. Goldin,* 48 Md.App. 154, 426 A.2d 410, 411 (1981) (holding that plaintiff did not meet the burden of proof necessary to establish a common law marriage, court observed that "Maryland has continuous-

## VI

██ Defendant contends that her due process rights were violated because any reasonable person would have concluded from the Department of Labor forms that the agency was only interested in knowing whether a ceremonial marriage had been performed. This contention is belied primarily by the fact that in 1962 appellant signed a statement that she had not "entered into a common-law marital relationship." This statement put appellant on notice that the Department of Labor was concerned about any marriage which could change her entitlement to benefits.

Defendant argues that, notwithstanding her signature on this statement, she had no reason to know the legal elements of common law marriage in South Carolina and should not be penalized for her lack of expertise. Given the actual notice provided in 1962, however, detailed knowledge of the common law doctrine would not have been necessary for an individual to be aware that benefits received only by virtue of being the widow of one man might be in jeopardy when the "widow" was living with another man and holding herself out, at least in certain circles, as the wife of the second man.

Nor do the Department of Labor forms preclude a reasonable interpretation that the agency might be interested in something other than a ceremonial marriage. Appellant sweeps with too broad a brush when she argues that it would not have been possible for her to comply with the agency's forms. Although the questions of when and where the marriage was performed might lead a person to think that only a ceremonial marriage was at issue, the broad references to changes in status would alert an individual to other possibilities. The clear meaning of the "Notice to Payee" statement is not that benefits are only to be terminated by a ceremonial marriage; instead the notice specifies that, in order for the lump sum payment to be made, a record of the remarriage should be furnished to the Department of Labor.

Government forms, moreover, are not written in stone. The appellant was given actual notice in 1962. Merely because a question is asked in a certain manner on a government form does not relieve an individual of the responsibility of notifying the agency where there are doubts about proper compliance with the requirements for receiving benefits.

The dissent raises the religious issue and refers to the cross-examination of the defendant as "a theological inquisition" and also questions a portion of the charge which refers to the "law of God." Under different circumstances this might be a cause of concern, but in the present case the appellant did not raise an exception or orally argue that she was prejudiced by the Biblical discussions she had with the Assistant United States Attorney or the judge's charge. In all probability this reluctance was due to the fact that appellant interjected religion into the case while she was on direct examination and carried a Bible throughout the trial, referring to it as "my security blanket."

AFFIRMED.

BUTZNER, Senior Circuit Judge, dissenting:

## I

In 32 states which do not recognize common law marriages, a soldier's widow can live with a man without forfeiting her pension or suffering prosecution for fraud because she signed the identical form the defendant signed. When the government through criminal prosecution draws a distinction between the marital status of soldiers' widows living in 18 states and those

---

ly held that a common-law marriage, valid where contracted, is recognized in this State."); *Harris v. Harris,* 257 N.C. 416, 126 S.E.2d 83, 85 (1963) (citing rule that if relationship of plaintiff and defendant, residents of South Carolina, constituted a common law marriage in South Carolina, such marriage would be given full recognition in North Carolina). Mrs. Seay, therefore, could have conceivably been prosecuted in other states for violations of § 1001 and § 1921 if her common law marriage had first been entered into in South Carolina.

living in the other 32, the government should be required to give fair notice that signing a form, which it provides, is a criminal act in some states although innocent in others.

At the most, the record discloses a civil controversy between the government and the defendant over her entitlement to a pension. Apparently this is the initial prosecution for fraud against a soldier's widow who has not disclosed her common law marriage. Consummating a common law marriage is not a criminal offense. Therefore, when the basis for a conviction for violating 18 U.S.C. §§ 1001 and 1921 is the nondisclosure of a common law marriage and the receipt of a pension after such a marriage, due process of law requires that the defendant have some notice that this relationship must be reported. *See Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). The statute itself does not give this notice. Nowhere in § 1921 is there a definition of marriage or an elaboration of the means of becoming married.

Furthermore, the "continuance of compensation" forms—the basis for defendant's conviction for misrepresenting her marital status—did not give this notice. Indeed, these forms mislead a soldier's widow with respect to the necessity of reporting a common law marriage. The forms require information only as to whether the widow had remarried and, if so, when and where the remarriage was performed. This would cause a reasonable pensioner to conclude that the government was interested only in reports of formally celebrated remarriages. A person has no obligation to inquire about the meaning of a government form which contains a latent ambiguity. *United States v. Race,* 632 F.2d 1114, 1121 (4th Cir.1980).

Similarly, the "notice to payee" sent to the defendant required a copy of the public record of marriage. This, too, would mislead the soldier's widow into believing that only celebrated marriages were required to be reported. This ambiguity in the government's definition of marriage is particularly inexcusable when the widow's representation that she had not entered into a marriage is the sole basis for her conviction of criminal fraud.

To sustain the prosecution by showing notice, the government relies primarily on a handwritten statement signed by the defendant in 1962 some 15 years before the prosecution. In it she said she had "not remarried or entered into a common law marital relationship." The statement, apparently written by a government agent, did not notify the defendant that upon entering into a common law marriage her pension would be terminated, nor did it advise her that such a relationship must be reported. It did not inform her that such a relationship was a "marriage" within contemplation of § 1921 providing criminal penalties for receipt of a pension after marriage. Her statement that she had not "remarried or entered into a common law marital relationship" was true. It was made before she moved in with Coke Seay.

Consequently, I am unable to accept the government's contention that the 1962 statement adequately notified the defendant that execution of a "continuation of compensation" form would constitute a fraudulent misrepresentation punishable by federal criminal law. Also, in light of the misleading text of the "continuation of compensation" form and the "notice to payee," she was not provided adequate notice that receipt of her pension after a common law marriage was a crime. As *Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), demonstrates, adequate notice is an essential component of due process when the prohibited conduct is not blameworthy in itself. *Lambert* involved a municipal ordinance that made it a crime for felons to fail to register with the police department. The Supreme Court held that the ordinance violated due process when applied to a person who had no actual knowledge of the duty to register and there was no proof of the probability of such knowledge. *Lambert,* 355 U.S. at 229–30, 78 S.Ct. at 243–44. Similarly, in this prosecution, the evidence did not show that the defendant had actual knowledge of the duty to report her common law marriage.

Nor was there proof of the probability of such knowledge, for, as I have pointed out, the forms the government furnished her were misleading because they referred only to ceremonial marriages. Here, as in *Lambert,* the defendant was denied due process of law because she did not receive from the government adequate notice of her statutory obligations arising out of her residence in a state that recognizes common law marriage.

## II

Another aspect of the case demonstrates that the defendant has been deprived of her liberty without due process of law. During the defendant's cross-examination, the prosecutor set about what best can be described as a theological inquisition. The record reveals numerous attempts by the prosecutor to inject religious issues in this jury trial. Referring to her contributions to her church, the prosecutor asked her if she gave "the widow's mite." After testifying that she swore she did not continuously live with Coke Seay, the prosecutor asked: "Didn't Jesus teach us that we are to be known by our work and that we are not to swear to things?" The prosecutor also examined her extensively from the Bible and about her beliefs concerning marriage and fornication. I have set forth in the margin excerpts from this impermissible cross-examination.* Although they illustrate the ob-

* Q  You agree with me that marriage is ordained by God?
A  I certainly do.
Q  And now, it is not a sacrament in the Baptist church. I believe it's a sacrament in the Catholic church, but it's not a sacrament in the Baptist church.
A  I don't know what a sacrament is.
Q  Well, there are only two sacraments in the Baptist church, the Lord's Supper and baptism.
A  That's correct.
Q  But you do agree with me that marriage is ordained by God?
A  I certainly do.
Q  Okay. I noticed yesterday you were carrying a Bible. Do you have it today?
A  Yes, I do. It's right there. That is a Bible that my parents gave to me in 1940.
Q  King James version?
A  That's exactly right.
Q  Do you mind if I use the New American Standard?
A  I don't like that.
Q  I am sorry. You mind if I use it?
A  I don't mind if you use it, but I don't like it.
Q  Turn with me if you will to Genesis 2, verses 18 and 24.
A  All right.
Q  Do you have it? Permit me to read it. "Then the Lord God said, 'It is not good for the man to be alone. I will make him a helper suitable for him.'"
Skipping down to verse 24.
"For this cause a man shall leave his father and his mother and shall cleave to his wife, and they shall become one flesh."
Doesn't say anything about a woman leaving her father and mother.
        *    *    *    *    *    *
Q  Turn with me if you will to Matthew 15, verse 19.
A  All right.
Q  Do you have that?

A  I certainly do.
Q  Jesus is speaking. Okay?
A  All right. I know that. Mine is in red.
Q  Mine too. "For out of the heart come evil thoughts, murders, adulteries, fornications, thefts, false witness, slanders."
        *    *    *    *    *    *
Q  All right. First Corinthians, 6. Do you have it? First Corinthians, 6, verses 9 through 11.
        *    *    *    *    *    *
A  All right.
Q  Paul writing to the Church at Corinth. "Or do you not know that the unrighteous shall not inherit the kingdom of God? Do not be deceived; neither fornicators, nor idolaters, nor adulterers, nor effeminate, nor homosexuals, nor thieves, nor covetous, nor drunkards, nor revilers, nor swindlers shall inherit the kingdom of God, and such were some of you, but you were washed, but you were sanctified, but you were justified in the name of the Lord Jesus Christ and in the spirit of our God."
        *    *    *    *    *    *
Q  The gospel.
A  That's correct. My gospel here, Mr. Ruschky. I do not like the wording of the new ones. It brings in about people that I don't appreciate.
Q  May I ascribe that to our difference in age, Ma'am?
A  Yes, you may.
Q  You know what fornication is?
MR. BELL [defense attorney]: Your honor, we object. This case is not having to do with adultery. It has to do with defrauding the government.
MR. RUSCHKY [prosecutor]: I didn't ask her what adultery was.
MR. BELL: We object to it. Fornication has nothing to do with this case. She has admitted this thing—

jectionable tenor of this prosecution, only by reading the entire transcript can one apprehend the prejudice the prosecutor sought to engender. It is quite apparent that the prosecutor's theological excursion injected into this trial the prejudicial notion that even if the defendant did not enter into a common law marriage with Coke Seay, she violated the "law of God" against fornication as expounded by the Bible. When a prosecutor oversteps the bounds of propriety and fairness in his cross-examination and it is impossible to say that the jury was not influenced by this misconduct, the conviction must be reversed. *See Berger v. United States,* 295 U.S. 78, 84–89, 55 S.Ct. 629, 631–633, 79 L.Ed. 1314 (1934).

### III

The prosecutor's cross-examination was exacerbated by the instructions to the jury. In explaining the intent necessary to consummate a common law marriage, the court charged:

> THE COURT: Well, I think he can ask her if she knows what it is.
> MR. BELL: Your honor, we also object because it is highly prejudicial. Mr. Ruschky knows what he is trying to do. He is trying to get someone to look at her as being a sinful woman against God, instead of a breaker of the law.
> THE COURT: I understand your position. You have said enough. Go ahead, Mr. Rushcky.
> By Mr. Ruschky:
> Q  Well, we are all sinners.
> *       *       *       *       *       *
> Q  You know what fornication is?
> A  No. I will tell you that. I don't know what fornication is.
> Q  Permit me to read you the definition from the South Carolina State Code.
> MR. BELL: I object to that again. Further object. She has said she doesn't know what it is.
> I object to Mr. Ruschky trying to read to the jury and to this court what fornication is. It has nothing to do with the elements in this case.
> MR. RUSCHKY: I will hand it up, let her read it for herself.
> MR. BELL: Object, your honor.
> THE COURT: I don't see any objection to her reading it. I don't understand what he intends to do.
> MR. BELL: We would object. It's irrelevant and immaterial.

The intent in marriage consists of living together by agreement of a man and woman as husband and wife, according to what we know to be the law of this state and according to what we believe to be the law of God.

Overruling an objection to the "law of God," the court stated: "Well, that was taken from a South Carolina Supreme Court decision."

This charge was likely to mislead the jury into thinking they could convict the defendant by ascertaining her intent "according to what we believe to be the law of God." The basis for this religious belief had been laid by the prosecutor's scriptural references to marriage and fornication. It was reinforced by the court's overruling of the objection pertaining to the injection of fornication into the trial of this case. I am persuaded the injection of these religious issues into this criminal trial deprived the defendant of the fundamental fairness

> THE COURT: Let's just stay away from these things, Mr. Ruschky.
> *       *       *       *       *       *
> MR. RUSCHKY: Your honor, there is more to fornication—
> THE COURT: All right. I will let you go ahead, since it's gotten to this point.
> By Mr. Ruschky:
> Q  You want to just read it, Ma'am?
> A  If it pleases you.
> Q  Well, I am not particularly pleased with it.
> *       *       *       *       *       *
> THE WITNESS: "Fornication defined. Fornication is the living together and carnal intercourse with each other or habitual carnal intercourse with each other without living together of a man and woman, both being unmarried."
> *       *       *       *       *       *
> Q  —You understand then that you were living with Coke Seay, living with him for approximately 18 years,—
> A  Not all that time, Mr. Ruschky. I beg to differ with you, sir. . . .
> I have not continuously lived in that house.
> Q  All right. I mean you say that.
> A  Yes, I say it, and I swear to it.
> Q  Now, it's not necessary for you to say that you swear to it. You are already under oath.
> A  That's right. That's exactly right. But I reiterate, please, sir.
> Q  Didn't Jesus teach us that we are to be known by our word and that we are not to swear to things?

which the due process clause was intended to assure as a hallmark of every criminal trial.

Also, the district court's charge that the elements of a common law marriage in South Carolina require an intent to enter into a marital relationship, "according to what we believe to be the law of God" inextricably introduced into this trial a religious test that runs afoul of the first amendment. In *Presbyterian Church v. Hull Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), the trial court found it necessary to weigh the significance and meaning of religious doctrines in order to resolve a property dispute. The Supreme Court held that the judgment must be reversed because courts cannot, consistently with the first amendment, determine ecclesiastical questions. 393 U.S. at 449–50, 89 S.Ct. at 606. Here, too, the judgment must be reversed because the court's charge impermissibly required the jury to determine the "law of God" in deciding whether the defendant had entered into a common law marriage.

Alternatively, the charge renders the concept of a South Carolina common law marriage impermissibly vague in the context of a federal criminal prosecution. In *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972), the Court held that a Jacksonville vagrancy ordinance was void for vagueness because it failed "to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" and encouraged arbitrary enforcement.

In this prosecution, the question of the defendant's intent when she lived with Coke Seay was central to the government's case. Without the intent to enter into a common law marriage, she could not be convicted under either § 1001 or § 1921 of the federal criminal code. Ecclesiastical history reveals that reasonable people have frequently differed over the meaning and content of the "law of God." The defendant, however, was convicted of a crime because an essential element of her marital status was determined by a jury according to what its members believed to be the "law of God." In view of the differences that reasonable persons can ascribe to the "law of God," this standard is impermissibly vague.

A widow of reasonable intelligence, charged with a crime for which guilt is dependent on proof of disputed marital status, cannot foretell whether her receipt of a pension is a crime when proof of her status depends on what individual members of a jury believe to be the "law of God."

Consequently, applying the principles explained in *Papachristou*, I conclude that the religious standard adopted by the district court in its charge rendered the concept of a South Carolina common law marriage so vague that the defendant was convicted without due process of law.

I would reverse the judgment of conviction.