**UNITED STATES of America, Appellee,**

v.

**George CONZEMIUS, Appellant.**

**No. 77–1983.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 15, 1978.

Decided· Nov. 13, 1978.

Rehearing and Rehearing En Banc
Dec. 6, 1978.

Jack S. Nordby of Thomson & Nordby, St. Paul, Minn., for appellant.

Daniel M. Scott, Asst. U. S. Atty., Minneapolis, Minn., argued, Andrew W. Danielson, U. S. Atty., Minneapolis, Minn., on brief, for appellee.

Before LAY, HEANEY and ROSS, Circuit Judges.

LAY, Circuit Judge.

George Conzemius appeals his conviction following a jury trial on seven counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371.[1] On appeal he basically challenges the sufficiency of the evidence to show that he possessed

sufficient knowledge or intent to commit the crimes charged. We affirm.

Defendant Conzemius was indicted with Ronald Gilbertson and Leonard McCracken for conspiracy and use of the mails in furtherance of a scheme to defraud the Hastings Co-op Elevator Association (Hastings) of profits from the sale of fertilizer through the use of two corporations, Upper Midwest Fertilizer, Chemical and Commodities, Inc. (Upper Midwest) and Rice County Fertilizer Company (Rice County).[2] Gilbertson was general manager of Hastings; McCracken was his assistant in charge of fertilizer. Conzemius was a member, but not an employee, of Hastings. Each was an owner and officer of Upper Midwest and Rice County.[3]

The scheme operated as follows: McCracken sold fertilizer from Hastings to third parties. The paper work proceeded through Upper Midwest and Rice County and those companies received most of the profits, which were more than $100,000 in the first four months. Sales of fertilizer to Hastings were also diverted through Upper Midwest such that Hastings paid a higher price and the corporation profited. Conzemius was treasurer of both corporations and the only person to sign company checks. Upper Midwest checks totaling more than $150,000 were paid to Hastings. Invoices and checks were transmitted through the mails. Hastings' directors did not know of Gilbertson's and McCracken's positions in the two corporations. Conzemius testified that he thought the two men had made full disclosures to Hastings.

Conzemius is a former school teacher and coach. He farms approximately 5,200 acres near Cannon Falls, Minnesota, and, during the period in question, was the majority whip of the Minnesota State Senate. He testified in his own defense and called sev-

1. His sentence was for 18 months.

2. The detailed facts of the overall fraudulent transactions are set forth in this court's earlier opinion wherein we affirmed the conviction of Leonard McCracken under the same counts of the indictment. *See United States v. McCracken*, 581 F.2d 719 (8th Cir. 1978). We here need

only outline the government's proof of the fraudulent scheme before discussing the evidence surrounding Conzemius' complicity.

3. A fourth, unindicted individual, William Ammentorp, also shared in Rice County.

eral character witnesses, including Minnesota Governor Rudy Perpich, the lieutenant governor, a Minnesota district court judge, a minister, several state senators, farmers, teachers and businessmen.

Conzemius does not dispute that the various transactions took place at the times and in the manner and amounts recited in the indictment. He denies, however, that there ever existed any criminal conspiracy to violate the mail fraud statute and further denies any knowledge or unlawful intent on his part. He contends that there is no evidence that he agreed to, adopted, aided and abetted, or knew of, any false or fraudulent pretense or representation or promise or concealment of any material fact, or that he criminally conspired to do so, or that he caused any mailing for such a purpose. We cannot agree.

■■■ It is fundamental under federal decisions that

A fraudulent scheme and conspiracy may be and usually is established by circumstantial evidence; by inferences from the evidence of relationship of the parties and by overt acts, conduct and other probative circumstances.

*Isaacs v. United States,* 301 F.2d 706, 724 (8th Cir.), *cert. denied,* 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962).

We fully agree with defendant's counsel that a defendant cannot be prosecuted for mail fraud through mere association or acquaintance with criminal conspirators. Our review of the record, however, convinces us that Conzemius was much more than an unknowing participant in a fraudulent scheme and that the evidence is sufficient to support the jury's verdict.

■■ The Government's proof of the conspiracy and Conzemius' knowledge of the scheme may be briefly summarized from the following facts: (1) Conzemius and McCracken formed Upper Midwest and Rice County, which were used to divert sales and purchases of fertilizer from Hastings; (2) this activity began immediately after the corporations were formed; (3) Conzemius knew that Gilbertson and McCracken were employed by Hastings and was well aware of their official positions in the cooperative; (4) the main business of the corporations was dealing in fertilizer; (5) the fertilizer transactions of the two corporations made extensive use of the mails; (6) Conzemius knew the fertilizer transactions were extremely profitable and that the price of fertilizer had greatly appreciated in 1973–74;[4] (7) Conzemius admitted knowledge of the transactions between Upper Midwest and Hastings as of July 8, 1974, although he denied knowledge of the specific transactions; (8) Barbara McCoy, who was hired to prepare all invoices for Upper Midwest, started work in Conzemius' basement on May 28, 1974, and at that time was shown how to prepare invoices by McCracken; Conzemius was present at this first meeting; although Conzemius denied specific knowledge of the invoice, it was at this time when McCoy prepared the first invoice for a sale of fertilizer to Hastings; (9) as financial officer of the two corporations Conzemius (a) had sole authority to issue checks on behalf of the corporations;[5] and (b) negotiated a loan for $150,-

---

**4.** Conzemius also knew the fertilizer market. His yearly fertilizer bill for his own farming operation averaged at least $250,000.

**5.** As the Government's brief argues and the record reflects, Conzemius had complete financial control of the corporations. He hired bookkeepers and an accountant to keep records of the financial transactions. He was the treasurer of both corporations and every check issued required his personal signature. He could and, in fact, later did force Leonard McCracken, the president of Upper Midwest, out of the company from his position as trea-

surer. Though he knew when Upper Midwest had funds available to purchase a grain mill and a farm he testified that he did not review Upper Midwest's financial statements or documents he was submitting to banks, or the books of the corporation and hence did not know whom the corporation was dealing with. In his role as treasurer, Conzemius knew no later than July 8, 1974, that Upper Midwest was purchasing from Hastings because he signed the first of several large checks in payment to Hastings. He admitted that knowledge.

000 on behalf of Upper Midwest under conditions which severely discredited his claim of lack of knowledge. The loan was secured by Upper Midwest's accounts receivable and inventory. Conzemius submitted a signed financial statement for Upper Midwest, dated June 12, 1974, with accompanying documents showing fertilizer sales to Hastings.

From the foregoing evidence we conclude the jury properly could infer Conzemius' knowledge of the scheme from his positions in Upper Midwest and Rice County. In *United States v. West*, 549 F.2d 545, 551 (8th Cir.), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1601, 51 L.Ed.2d 806 (1977), we observed:

> It would strain credulity and defy logic to conclude that the key officer of a corporation would not be generally familiar with the financial affairs of the company and keep himself informed of its practices in obtaining funds necessary to operate business on a day-to-day basis. The district court properly considered the circumstance of [defendant's] position in the corporation in deciding the question of knowledge.

In addition Conzemius' claim of lack of knowledge is discredited by other testimony. Conzemius' assertion that he was familiar with the fertilizer transactions only in a general way is contradicted by his decision, prompted by an article in the Wall Street Journal, to revoke McCracken's authority to purchase fertilizer. The jury also could consider Conzemius' claim that he did not closely supervise Upper Midwest's activities with evidence indicating that he supervised his other farming activities daily. It is evident that the jury in returning a guilty verdict rejected Conzemius' explanation and the array of character witnesses who testified on his behalf.

 The jury also had before it evidence of a series of check exchanges between the three defendants and Hastings. The record shows that in February 1975, Hastings was experiencing a liquidity crisis. It was approaching the legal loan limit of the Northwest Bank of Hastings, where it had maintained a checking account. All three defendants were shown to use a series of check exchanges with Hastings which attempted to maintain the balance of Hastings' checking accounts below the bank's loan limits. The Government's proof showed that the three men issued checks to Hastings, then Hastings issued checks for identical amounts back to them. The Government contends evidence of the check exchange was relevant to show an attempt to aid their overall scheme by keeping Hastings facially solvent to do business so that defendants could continue dealing with Hastings at their own enrichment. We agree with the trial court that the evidence was relevant. We think it further evidences the overall working relationship among the three conspirators and is relevant as well to show knowledge by Conzemius of conduct in furtherance of the overall scheme to continue the unlawful transactions.

The judgment of conviction is affirmed.[6]

---

**6.** Conzemius also raises three other grounds for reversal: (1) that the trial court erred on voir dire in informing the jurors that Ronald Gilbertson and Leonard McCracken previously had been found guilty in separate trials as to the same counts of the indictment; (2) that statements of Gilbertson and McCracken were improperly admitted as being coconspirators' statements; and (3) that certain check exchanges by Conzemius, Gilbertson and McCracken and Hastings were improperly admitted since they were not relevant to proof of any fraud. None of these contentions has any merit.

First, Conzemius' counsel clearly acquiesced in the trial court's voir dire of the jury. The court's inquiry of the prospective jury instructed the jury to disregard any possible connection between Gilbertson's and McCracken's guilt and the trial involving Conzemius. Under our decisions the trial court did not err. *See Gerberding v. United States*, 471 F.2d 55, 60 (8th Cir. 1973); *Koolish v. United States*, 340 F.2d 513, 529–31 (8th Cir.), *cert. denied*, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965). Furthermore, Conzemius' defense was based on his lack of knowledge of McCracken's and Gilbertson's unlawful conduct. Under the circumstances, if the jury were to believe Conzemius, the fact that McCracken and Gilbertson were guilty would not be prejudicial to that defense.

Second, there clearly was strong circumstantial evidence proving a conspiracy. Under

these circumstances the trial court properly allowed evidence of the out-of-court statements of both Gilbertson and McCracken.

Finally, as previously discussed, there can be little argument that the trial court abused its discretion in finding the check exchange relevant. Assuming, however, as Conzemius urges, this check exchange was nothing more than short term loans to Hastings, its admission into evidence, if not relevant, hardly can be deemed so prejudicial as to constitute reversible error.