UNITED STATES of America, Appellee,

v.

Ronald O. GILBERTSON, Appellant.

No. 77–1992.

United States Court of Appeals,
Eighth Circuit.

Submitted June 15, 1978.

Decided Dec. 5, 1978.

Wood R. Foster, Jr., of Grossman, Karlins, Siegel & Brill, Minneapolis, Minn., for appellant.

Daniel M. Scott, Asst. U. S. Atty., Minneapolis, Minn., for appellee; Andrew W. Danielson, U. S. Atty., Minneapolis, Minn., on the brief.

Before LAY, HEANEY and ROSS, Circuit Judges.

LAY, Circuit Judge.

Ronald Gilbertson appeals his conviction on six counts of mail fraud in violation of 18 U.S.C. § 1341, one count of conspiracy to commit mail fraud under 18 U.S.C. § 371 and one count of making a false statement to a government agency in violation of 18 U.S.C. § 1001. He received a sentence of 30 months. On appeal he challenges the sufficiency of the evidence relating to the mail fraud convictions. He also denies any in-

tent to make a false statement to a government agency. Finally, Gilbertson urges that the cumulative effect of inadmissible evidence precluded a fair trial on all counts. We affirm.

*Mail Fraud.*

Gilbertson, George Conzemius and Leonard McCracken were jointly indicted for conspiracy and use of the mails in furtherance of a scheme to defraud the Hastings Co-op Elevator Association (Hastings) of profits from the sale of fertilizer through the use of two corporations, Upper Midwest Fertilizer, Chemical and Commodities, Inc. (Upper Midwest) and Rice County Fertilizer Company (Rice County). Gilbertson was the general manager of Hastings; McCracken was his assistant in charge of fertilizer. Conzemius, although not an employee, was a member of the cooperative. Each was an owner and officer of Upper Midwest and Rice County.[1]

In *United States v. McCracken*, 581 F.2d 719 (8th Cir. 1978), and *United States v. Conzemius*, 586 F.2d 97 (8th Cir. 1978), the separate convictions of McCracken and Conzemius were affirmed by this court. The detailed facts of the overall fraudulent transactions are set forth more specifically in the *McCracken* opinion. We need here only outline the factual proof relating to the fraudulent scheme before discussing Gilbertson's complicity.

The scheme operated as follows: McCracken sold fertilizer from Hastings to third parties. The paper work proceeded through Upper Midwest and Rice County and those companies received most of the profits, which were more than $100,000 in the first four months. Sales of fertilizer to Hastings were also diverted through Upper Midwest such that Hastings paid a higher price and the corporation profited. Conzemius was treasurer of both corporations and the only person to sign company checks. Upper Midwest checks totaling more than $150,000 were paid to Hastings. Invoices and checks were transmitted through the mails. Hastings' directors did not know of Gilbertson's and McCracken's positions in the two corporations.

Gilbertson denies any knowledge of a fraudulent scheme. He urges that the record is undisputed that in May 1978, it was McCracken and Conzemius who originally incorporated Upper Midwest. Gilbertson acknowledged that McCracken had asked to leave Hastings in order to go into the wholesale fertilizer business but stated that McCracken did not mention Conzemius in connection with the new business. Although Conzemius, McCracken and Gilbertson all met on May 27, 1974, according to Gilbertson the meeting did not involve the sale of fertilizer by Hastings to Upper Midwest but instead related to a discussion of locating a barge site. The evidence showed that it was shortly after this meeting that McCracken began his fraudulent dealings between Hastings and Upper Midwest.[2]

The exact date of Gilbertson's entry into Upper Midwest was not established. The corporate records revealed that he became vice president of Upper Midwest on June 3, 1974. It is clear that by July 5, 1974, at a meeting attended by Gilbertson, where William Ammentorp was offered a buy-in option to Upper Midwest, Gilbertson had already become a one-third owner. The record also shows that at that same meeting a discussion of fertilizer sales between Hastings and Upper Midwest took place.

Gilbertson also urges that the record is barren of any knowledge on his part of fertilizer transactions between Hastings and Upper Midwest until late summer or fall of 1974. This claim contradicts McCracken's testimony that it was Gilbertson who gave him permission to sell Hastings' fertilizer to Upper Midwest. Gilbertson urges, however, that the jury discredited McCracken's testimony since it acquitted

---

1. A fourth, unindicted individual, William Ammentorp, also was an owner and officer in Rice County.

2. The record shows of the total of 31 railway cars of fertilizer that arrived at Hastings in the summer of 1974, 26 were diverted to Upper Midwest and Rice County.

Gilbertson of Counts IV and V, which alleged mailings on May 28, 1974, and June 3, 1974. Thus, the defense argues, the jury necessarily agreed with Gilbertson's version that he did not become involved with Upper Midwest until approximately July 20, 1974. It is also urged that Gilbertson was not aware of any conflict of interest or of specific dealings between Hastings and Upper Midwest. Our reading of the record causes us to disagree.

■ The Government as verdict holder is entitled to all reasonable inferences from the evidence adduced. And as we recognized in *McCracken* and *Conzemius*, the well-settled rule is that the jury is entitled to infer intent to defraud from all of the facts and circumstances surrounding the case. Although the jury may have found insufficient corroboration from the Government's evidence to accept McCracken's testimony concerning Gilbertson's early complicity in the scheme, this does not mean, as a matter of law, that we must disregard all of McCracken's testimony. The jury could find McCracken's testimony concerning the counts relating to mailings subsequent to June 4 to be corroborated. The fundamental issue still remains whether there existed sufficient evidence for the jury to find beyond a reasonable doubt that Gilbertson became an instrumental participant in the fraud.

■ The Government summarizes the evidence which provided a sufficient basis for the jury to find Gilbertson's complicity in the fraud. The Government's proof showed:

(1) that Gilbertson was an officer and owner of Upper Midwest and Rice County; (2) that Gilbertson received money from both companies as salary and in exchange for stock; (3) that McCracken was Gilbertson's fertilizer manager; (4) when McCracken announced he was leaving, Gilbertson allowed him to work both jobs; (5) that McCracken had informed Gilbertson that he was going into the wholesale fertilizer business and had received permission from Gilbertson to purchase excess Hastings fertilizer for resale; (6) that McCrack-

en told Gilbertson that one of his partners was to be George Conzemius; (7) that most of the telephone calls made to negotiate sales of fertilizer on behalf of Upper Midwest were made from Hastings' telephones; (8) that Gilbertson and the other defendants met at regular intervals to discuss the business of Upper Midwest, a portion of these discussions concerned the sale of fertilizer and its profitability to Hastings; (9) that a grain mill and a farm were purchased from the proceeds of sales made by Upper Midwest, Gilbertson approving the purchase offer for the grain mill; (10) that Gilbertson was present on at least one occasion when it was made clear that Ammentorp would have to pay to obtain the same share in the company as Gilbertson already had; (11) when confronted by Virginia Gardell, Hastings' bookkeeper, with evidence that Upper Midwest had purchased large amounts of fertilizer from Hastings at low profit levels, Gilbertson told her not to discuss the matter with anyone; (12) that Gilbertson supplied no substantial help in the actual operation of the companies but received a one-third share; (13) that Gilbertson accepted salary payments from Upper Midwest and became a stockholder in Rice County; and (14) that Gilbertson did not inform Hastings of his or McCracken's relationship with Upper Midwest or of Upper Midwest's relationship to Hastings.

In addition, Gilbertson, in his testimony, admitted that McCracken had told him that he was going into the fertilizer wholesale business. He testified that he knew by July 5, 1974, and possibly as early as May 27, 1974, that George Conzemius and Leonard McCracken were in business together. He further testified that he had been present at the July 5, 1974, meeting and had engaged in the discussion concerning when McCracken was going to leave Hastings to work full time with Upper Midwest. Gilbertson also admitted that in August 1974, he knew that McCracken had been dealing with the elevator in the fertilizer business and that he continued to allow McCracken to do so. Finally Gilbertson never informed the board of his actual participation in Up-

per Midwest Fertilizer and Rice County Fertilizer. He never told the board "in so many words" what his involvement was.

Finally, Gilbertson's denials of knowledge were controverted by the facts. He said he never knew that he was a shareholder in Upper Midwest, yet he not only received checks with Upper Midwest's corporate name upon them but also exchanged checks to make himself a shareholder of Rice County in the fall of 1974. His denial that he heard the discussions concerning fertilizer at a July 5, 1974, meeting, was in direct conflict with the notes taken by William Ammentorp showing that a fertilizer discussion took place. He failed to remember the buy-in option offered Ammentorp, although it was discussed on both July 5, 1974, and July 27, 1974. Hastings' board members denied that Gilbertson had ever told them of his directorship of King Grain. This was in direct conflict with Gilbertson's testimony. We find the evidence overwhelmingly supports the verdicts of guilty agreed upon by the jury.

*Count VIII.*

■ Gilbertson was individually indicted and convicted under Count VIII for mail fraud arising from sending false inventory reports under a three-party loan agreement between Hastings, St. Paul Bank for Cooperatives and Cooperative Finance Association, Inc. (CFA), a subsidiary of Farmland Industries. The loan agreement was arranged to finance Hastings' fertilizer inventory purchased by Hastings from Farmland. Under the agreement Hastings was to report its monthly closing inventory of Farmland fertilizer and to remit payment to Farmland for the difference, if any, between the closing inventory on hand and Hastings' account balance with Farmland. In this manner Farmland would be paid for the fertilizer Hastings had sold during the month from the fertilizer previously purchased by it from Farmland. Under the agreement Farmland paid interest on the loan for all fertilizer not sold and remaining

in Hastings' inventory. The Government's proof evidenced that Hastings had sold four carloads of Farmland's fertilizer to Upper Midwest during September 1976. The evidence established that Hastings made no fertilizer payments to CFA in September. The inventory report in September failed to show any sales by Hastings.

Virginia Gardell, Hastings' bookkeeper who prepared the September fertilizer inventory report, stated that the figure listed under available inventory included inventory which Hastings had not yet paid for and that Hastings was required to pay the difference between the available inventory and ending inventory, to the extent the latter figure was less than the former.[3] Gardell testified that she entered, at Gilbertson's direction, the available inventory figure as the ending inventory and reported no sales for the month of September, "[b]ecause we did not have any available money to pay for fertilizer and therefore we filled it out so that we did not have to pay for fertilizer." As indicated, the evidence established that in September Hastings did sell fertilizer purchased from Farmland.

Gilbertson's defense is that the inventory was not false since the closing inventory was based on Hastings' overall inventory and that Hastings had an obligation to pay only on the difference between its overall inventory and the account balance. Under this construction, however, as the Government points out, Hastings' obligation to Farmland would not arise unless its overall inventory was less than the account balance with Farmland. Under this theory Farmland would continue paying interest on the full loan even though Hastings had collected monies on the fertilizer purchased from Farmland with the loan proceeds. The security agreement is directly to the contrary. The three-party loan agreement applied only to inventory purchased from Farmland. We find sufficient evidence to support Gilbertson's conviction on this count.

3. In this regard she was in error since the loan agreement required payment between the difference of the closing inventory and the account balance.

*Count IX.*

Gilbertson was individually indicted under Count IX of the joint indictment for knowingly making a false statement on a warehouse report in violation of 18 U.S.C. § 1001. The facts essentially are not disputed. Summarized briefly, Hastings had entered into a contract, known as a uniform grain storage agreement, with Commodity Credit Corporation (CCC), an agency of the United States Department of Agriculture. The contract allows local elevators to store grain which has been pledged by producers for price support loans. Because such grain could only be stored at CCC-approved elevators, the Transportation-Warehouse Division of the Department of Agriculture conducts examinations of warehouse facilities under contract with the CCC in order to determine whether, according to the grain storage agreement, the warehouse is suitable for storage and that the warehouse's inventories as reflected in its records are actually on hand. The examination was conducted at Hastings in early September 1974 and the resulting report formed the basis for Count IX.

During the examination of Hastings' assembly book, which was a compilation of the current account of each farmer having grain stored at the elevator, the examiners noticed that each page was "priced out;" i. e. a price had been entered on each page. Upon inquiry the examiners were assured that the grains belonged to the elevator, not stored grain belonging to others. Based on that inquiry the examiners prepared a "Statement of Total Obligations," which listed no grains at the elevator belonging to other parties but not receipted. Gilbertson certified the truth of the statement. The statement that there was no nonreceipted grains belonging to others at the elevator was untrue. At trial the parties stipulated that there were large amounts of grain which were treated as stored between Hastings and the producers.

Hastings' employee Francis Pavek testified concerning the "pricing out" of the assembly sheets. He stated that Gilbertson had instructed him at various times to price the grain in the assembly sheets for inventory purposes and that the pricing was done off and on at Gilbertson's instructions. Pavek agreed, however, that the effect of "pricing out" the assembly sheets could be that all grain belonging to others but not receipted would appear to be grain which the elevator had contracted to buy at a specific price.

Gilbertson testified that there was a standing practice at the elevator to "price out" the inventories at the end of each month, that the priced out value was used in order to obtain a book value for insurance purposes and to obtain a value for inventory for the monthly operating statement. Gilbertson also stated that he relied on state law in pricing the grain.

■ The elements of the offense are (1) a statement; (2) falsity; (3) materiality; (4) specific intent; and (5) agency jurisdiction. *United States v. Lanier*, 578 F.2d 1246, (8th Cir. 1978). There is no question that the statement was false and within the jurisdiction of an agency of the United States. Gilbertson here attacks the sufficiency of evidence as to intent and materiality.

■ Gilbertson argues that the evidence precludes a finding of intent. Much of Gilbertson's argument, however, is devoted to the reasons given for "pricing out" the assembly sheets. As the Government notes, the reasons for "pricing out" the assembly sheet do not detract from the fact that the certification was false. The Government urged at trial and on appeal that each of his explanations had no rational relationship to the "pricing out" of the assembly books. He testified that the year-end inventory was one reason for pricing out the assembly books. The Government urges, however, that the prices in the assembly books bore no relationship to the year-end inventory prices. Gilbertson further testified that monthly profit and loss statements required the pricing out of the assembly books. The Government showed, however, that but a single price was placed upon the grain in the assembly books, whereas the price of the various grains had severe fluctuations each month. Gilbertson also testified that

the pricing out was for insurance purposes. However, the Government argues that Hastings used an average price for each commodity. The evidence further showed, and Gilbertson admitted, that the price had little relationship to the actual selling price arrived at between the cooperative and the farmer. Finally, Gilbertson testified that he relied upon a state law which allowed him to treat the grain as cash grain. However, the evidence showed that he did not treat the grain as cash grain and that, in fact, the grain was readily convertible to warehouse receipts and had on occasion been converted to warehouse receipts after being "cash grain" for several months. We find that Gilbertson's explanations and the Government's refutation of them provided issues of credibility that were resolved by the jury against the defendant.

▆ Gilbertson also argues that his false statement was not material in that Hastings had sufficient stock of grain on hand at various storage facilities to satisfy the maximum number of bushels which at that time could have been converted into warehouse receipts had every farmer demanded a warehouse receipt. However, the parties stipulated that the amount of corn on storage agreements at Hastings exceeded the amount on hand. The "sufficient stocks" Gilbertson testifies to were located at other storage facilities. While the grain stocks might have been interchangeable in terms of Hastings' internal management, the examiners testified that their primary concern was to make sure that the elevator in fact had sufficient grain on hand to cover what in fact was a storage obligation to someone else and that the grain was stored in approved facilities. In addition the CCC examiners testified that they must rely on the accuracy of the records as they relate to the physical inventory to determine whether there is enough physical inventory on hand to cover the storage obligations. If the records are inaccurate the examiners have no way of comparing physical inventory with what should be available. Further, the evidence established that Hastings treated all grain as elevator-owned when in fact it was not and that determining which grain was farmer-owned and which was elevator-owned would have required Hastings to contact each farmer to determine the status of his grain. Under the circumstances the statement certified by Gilbertson, i. e., whether Hastings was in compliance with its agreement with the CCC, was a "material" statement. *See Blake v. United States,* 323 F.2d 245, 247 (8th Cir. 1963).

We find the evidence is sufficient to sustain Gilbertson's conviction on this count.

*Evidence of the Check Exchange.*

Gilbertson contends that the trial court erred in admitting evidence of a series of check exchanges between the three defendants and Hastings. We do not agree. As noted in our earlier opinion in *United States v. Conzemius,* 586 F.2d 97, 100 (8th Cir. 1978), where a similar claim was made, we think evidence of the check exchange was relevant to show the working relationship among the three conspirators.

*Fair Trial.*

Finally Gilbertson argues that he was denied a fair trial because of the cumulative impact of the following: (1) his conviction on Count VIII, the fertilizer report charge, was without any basis in fact; (2) his conviction on Count IX, the CCC charge, was without any basis in fact; (3) the evidence introduced on the fertilizer report charge and the CCC charge was confusing; (4) evidence of the check exchange should not have been admitted; and (5) extensive testimony concerning Count X, which the Government dismissed just prior to concluding its case in chief, further confused the jury.

Gilbertson's argument, however, loses most of its force since the evidence is sufficient to sustain his conviction on Counts VIII and IX and evidence of the check exchange was properly admitted. The remaining evidentiary grounds do not support Gilbertson's claim that he was denied a fair trial. *See United States v. Quinn,* 467 F.2d 624, 627 (8th Cir. 1972), *cert. denied,* 410 U.S. 935, 93 S.Ct. 1390, 35 L.Ed.2d 599 (1973).

The judgment of conviction is affirmed.