**UNITED STATES of America, Appellee,**

v.

**Paul G. BROWN, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**STONE'S PHARMACY, INC., Appellant.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1984.

Decided June 5, 1985.

Rehearing and Rehearing En Banc
Denied July 5, 1985.

Stanley D. Rauls and Samuel Perroni, Little Rock, Ark., for appellant.

Sandra Wilson Cherry, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before BRIGHT, McMILLIAN and BOWMAN, Circuit Judges.

BRIGHT, Circuit Judge.

Appellants Paul Brown and Stone's Pharmacy, Inc. (the "Corporation") appeal from convictions in a jury trial on forty-seven counts of filing false claims for payment under the Medicaid Program in violation of 42 U.S.C. § 1396h(a)(1)(i) (1982). On appeal, appellants contend, *inter alia*: (1) that the district court erred in admitting evidence obtained from a search of the Corporation's records pursuant to a warrant because that warrant was obtained on the basis of information uncovered by a prior warrantless search of the Corporation's records, (2) that the Government's evidence failed to prove that the appellants knowingly and willfully caused false statements to be submitted, and (3) that the false statement counts alleged in the indictment were immaterial as a matter of law because they did not contain a misrepresentation of a material fact. We vacate the convictions on counts 24–47 and 50–53, and affirm the convictions on counts 1–16, 23, and 48–49.

## I. BACKGROUND.

Paul Brown is the president and majority stockholder of the Corporation, an authorized provider of pharmacy services under the Arkansas Medicaid Program. The Corporation became a provider by entering into a

contract with Arkansas Social Services ("ASS") to furnish prescription drugs to Medicaid recipients. The terms of the contract required the Corporation to maintain for three years permanent business records of all prescriptions dispensed to Medicaid recipients, purchase invoices for drugs covered under Medicaid, and documentation verifying prescription charges to the general public. The contract also required the Corporation to make those records available to ASS officials or their designated agents for periodic audits.

Upon dispensing medication to a Medicaid recipient, the Corporation would submit a claim for reimbursement to Blue Cross and Blue Shield ("BCBS"), which processes Medicaid claims in Arkansas. Arkansas operates its Medicaid Program on an "open formulary" basis, which means that all drugs not explicitly excluded are reimbursable. Substitution of generic drugs is permissible under Arkansas law unless explicitly prohibited by the prescribing physician, *see* Ark.Stat.Ann. §§ 72–1047, 72–1048 (1979); 1979 Ark. Acts 675. In fact, ASS encourages providers to dispense generic drugs whenever possible. *See* Division of Social Services, Arkansas Department of Human Services, Arkansas Medicaid Provider Manual § S–1.10 (1980).

The indictment brought by the Government alleged that Brown and the Corporation knowingly and willfully caused false claim forms to be submitted to BCBS on forty-seven separate occasions. Counts 1–12 involved false claim forms resulting from undercover activities during an investigation of the Corporation. Counts 13–16 involved false claim forms uncovered in a "clinic" conducted by ASS. Counts 23–49 involved false claim forms submitted in connection with the filling and twenty-six subsequent refillings of a prescription for

one Medicaid recipient, Norma Morgan. Counts 50–53 involved false claim forms submitted in connection with the filling and three subsequent refillings of a prescription for another Medicaid recipient, Roosevelt Coombs. After a four-day trial, the jury found the appellants guilty on all forty-seven false statement counts.[1]

## II. DISCUSSION.

### A. Search and Seizure.

On June 7, 1983, Howard Cecil, director of the Medicaid Fraud Division of the Arkansas Attorney General's Office ("MFD"), accompanied by an ASS pharmacist, entered Stone's Pharmacy and advised Brown that he wanted to review certain books and prescription records. This "audit" was part of an ongoing criminal investigation overseen by the United States Attorney's office,[2] not a routine administrative audit. FBI Special Agent Robert Brazile planned the audit with Cecil, but did not accompany Cecil during the actual audit because the statutory authority to conduct such audits extends only to personnel from the Attorney General's office and prosecuting attorneys. Ark.Stat.Ann. § 41–4410(3) (Cum. Supp.1983). Cecil completed the audit and reported what he had learned to Brazile. Brazile then entered the pharmacy, identified himself to Brown, advised Brown of the joint investigation, and summarized the information the investigation had uncovered to date.

On June 17, 1983, agents of the MFD and FBI conducted a search of the Corporation pursuant to a warrant issued on June 15. During this search, the agents seized copies of certain prescriptions. Before trial, the appellants moved to suppress all the documentary evidence seized by the Government during the June 17 search on

---

1. The Government also alleged, in counts 17–22 of the indictment, that Brown and the Corporation had devised a scheme to defraud the United States involving the submission of false Medicaid claim forms through the mail in violation of 18 U.S.C. § 1341 (1982). The jury acquitted both defendants on all six counts of mail fraud. Those counts are not at issue on this appeal.

2. MFD officials contacted the United States Attorney's office for the Eastern District of Arkansas after they commenced their investigation into the Corporation. In April 1983, the United States Attorney, anticipating that search warrants would be issued, requested the assistance of the FBI. From that date on, all three units participated jointly in the investigation.

the ground that the search warrant was tainted by the allegedly illegal warrantless search of June 7. After an evidentiary hearing, the district court denied the motion, finding that the appellants had consented to the June 7 search or, alternatively, that a warrant was not required for what was essentially an administrative inspection.

Appellants contend that the district court erred in admitting the documentary evidence seized from the Corporation during the June 17 search. Although that evidence was seized pursuant to a search warrant, appellants maintain that it should have been suppressed because the search warrant was obtained on the basis of information uncovered during the allegedly improper warrantless inspection of the Corporation's records on June 7. We disagree.

■ A warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search.[3] *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (recharacterizing the "voluntary waiver" exception originally enunciated in *Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1277 (1946),[4] in terms of "voluntary consent"). Appellants do not contend that the Corporation[5] did not knowingly and voluntarily enter into a contract with ASS. Rather, they challenge, on two levels, the district court's finding, based on the contractual language, that the Corporation explicitly consented to warrantless searches of pharmacy records. First, they broadly assert that the Corporation did not consent, by entering into the contract with ASS, to waive its fourth amendment right to be

free from warrantless searches. The thrust of this argument apparently is that the commands of the fourth amendment are inviolable. We disagree.

In *United States v. Griffin,* 555 F.2d 1323 (5th Cir.1977), a pharmacist appealed from his conviction on charges of filing fraudulent Medicaid claims, asserting that the trial court had erred in admitting evidence seized during a warrantless inspection of the pharmacy's records. The court cited *Zap* in support of its determination that the pharmacist had consented to a warrantless search of the pharmacy's books and records when he knowingly and voluntarily entered a contract in which he agreed to maintain certain records and make them available for inspection. *Id.* at 1325. *See also United States v. Jennings,* 724 F.2d 436, 447–48 (5th Cir.) (citing *Griffin* in· reaching identical holding in context of submission of false claims for meals served to children), *cert. denied,* —— U.S. ——, 104 S.Ct. 2682, 81 L.Ed.2d 877 (1984); *First Alabama Bank v. Donovan,* 692 F.2d 714, 718–20 (11th Cir.1982) (finding consent to reviews by Department of Labor of bank's employment records to determine compliance with antidiscrimination regulations).

■ The situation in *Griffin* is virtually identical to the circumstances presented in this case and we agree with the reasoning of the Fifth Circuit. The government has a substantial interest in establishing methods by which it can effectively monitor compliance with the regulations governing the Medicaid Program and root out opportunities for and instances of fraud. We see no constitutional infirmity in the government requiring a provider to agree to maintain

3. The Government also urges that the June 7 search fell within the parameters of the "regulated business" exception to the warrant requirement applicable to administrative searches and seizures. *See United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). In light of our holding that appellants consented to the June 7 inspection, we need not consider the applicability of the regulated business exception.

4. On a second petition for rehearing, the Supreme Court vacated the judgment and remanded to the district court for a dismissal of the indictment. 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947).

5. The parties to the contract are ASS and the Corporation. Brown, the principal shareholder of the Corporation, signed the agreement as the authorized agent of the Corporation.

records of Medicaid transactions and to permit periodic audits of those records as a condition for participation in the Medicaid Program. In this case, the appellants were aware of this condition, and voluntarily entered into a contract with ASS in which they authorized such audits in exchange for obtaining the benefits attendant to participation in the Medicaid Program. Accordingly, we hold that the appellants explicitly consented to reasonable warrantless inspections of the pharmacy records by entering into the contract with ASS. The June 7 inspection occurred during business hours and in the presence of Brown and nothing in the record suggests that the inspection was conducted in an unreasonable manner.

The appellants also raise a more specific challenge to the district court's finding of consent. They contend that even if they did consent to a warrantless search by entering into the contract with ASS, that consent extends only to routine civil audits conducted by ASS personnel, and not to searches conducted to gather evidence in the course of a federal criminal investigation. This argument, too, must fail.

ASS compiled a manual, entitled the "Medicaid Provider Manual," which contained instructions, state and federal regulations, and specific policies relating to the Medicaid Program. ASS supplies a copy of the manual to any pharmacy contemplating whether to become a provider. When a pharmacy agrees to participate in the Medicaid Program, it agrees to be bound by all valid regulations and laws as set forth in the Manual. Sections 2.02 and S–1.11 of the Manual provide that audits of provider

pharmacies may be conducted by MFD agents—the criminal fraud division of the Office of the Attorney General. In addition, the Arkansas legislature, in an attempt to eliminate fraud in the Medicaid Program,[6] added section 41–4410 to the Code in 1979. That section provides, in pertinent part:

(2) No person shall be eligible to receive any payment from the Arkansas Medicaid Program * * * unless such person has, in writing, authorized the Commissioner of Arkansas Social Services to examine all records for the purpose of investigating whether any person may have committed the crime of Medicaid fraud, or for use or for potential use in any legal, administrative or judicial proceeding.

(3) The Attorney General and the Prosecuting Attorneys shall be allowed access to all records of persons and Medicaid recipients under the Arkansas Medicaid Program to which the Commissioner of Arkansas Social Services has access for the purpose of investigating whether any person may have committed the crime of Medicaid fraud, or for use or potential use in any legal, administrative or judicial proceeding.

Ark.Stat.Ann. § 41–4410(2), (3) (Cum.Supp. 1983).

The statute and regulations clearly contemplate that audits may be conducted pursuant to a criminal investigation.[7] Appellants had at least constructive, if not actual, knowledge of the statute and ASS policies and yet entered the contract and continued to participate in the Program. Ac-

---

6. See Ark.Stat.Ann. § 41–4401 preamble (Cum. Supp.1983); 1979 Ark. Acts No. 823, § 13.

7. Appellants resist this straightforward reading of the statutory language. They point to subsection (4) of section 41–4410 which provides: "(4) Notwithstanding any other law to the contrary, no person shall be subject to any civil or criminal liability for providing access to records to [any of the authorized agents]." They assert that this language reflects the legislature's intent that a provider not be subjected to criminal liability for providing access to records to appropriate state agents. We disagree. Appel-

lants' construction of subsection (4), if accepted, would negate the express language in subsections (1), (2), (3), and (5), and the expressed intent of the Arkansas legislature in enacting the statute. It is also of no little import that section 41–4410 is contained in the criminal offenses title of the Arkansas Code. Although we have been unable to find any cases construing subsection (4), we think that it obviously was intended to shield any employee of a provider from criminal prosecution or civil liability to the provider for providing state officials with access to the provider's records.

cordingly, we hold that appellants expressly consented to an inspection of the Corporation's records undertaken to determine if the appellants were committing Medicaid fraud.

We note, in any event, that Cecil did not actually seize any documents or other evidence during the June 7 inspection. The contested evidence was seized during the June 17 search which was conducted pursuant to a warrant. Because we hold that appellants expressly consented to an audit of the Corporation's records, even if undertaken in the course of a criminal investigation, the warrantless inspection of the Corporation's records on June 7 was valid. Consequently, it could not have tainted the June 17 search and seizure. Accordingly, the district court did not err in denying the appellants' motion to suppress the documentary evidence seized in the June 17 search.

**B. Sufficiency of the Evidence.**

The Government charged in each count of the indictment that the appellants dispensed a generic drug but submitted a claim to BCBS for a more expensive brand name drug. Appellants assert that the evidence adduced by the Government was insufficient to establish a violation of 42 U.S.C. § 1396h(a)(1)(i)(1982).[8] Specifically, they contend that the Government did not introduce sufficient evidence to establish that Brown knowingly and willfully caused false claim forms to be submitted.[9] They note that even the Government conceded

that the remittance advices[10] showed that the appellants had dispensed and billed for generic drugs on thousands of occasions. Consequently, they maintain that the specific instances of dispensing generics and billing for brand name drugs charged in the indictment constituted evidence only of errors in preparing and submitting claims (negligence), rather than of a knowing and willful intent to submit false claims. In addition, Brown contends that the Government failed to introduce any evidence showing who prepared the claim forms, how they were prepared, or what records were used in their preparation, and, consequently, did not prove that *he* caused the false claims to be submitted.

The Government must, of course, introduce evidence to prove each element of a crime, but the evidence is sufficient to support a criminal conviction if, when viewed in the light most favorable to the Government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see United States v. Yancy,* 688 F.2d 70, 71 (8th Cir.1982). Appellants cannot succeed on a challenge to the sufficiency of the evidence simply because the Government lacks direct evidence of the intent to defraud. The jury may properly infer that intent from circumstantial evidence; indeed, circumstantial evidence is often the "only available means of proving intent." *United States v. Huckaby,* 698 F.2d 915,

---

8. Section 1396h(a)(1)(i) provides, in pertinent part:

 Whoever—
 (1) knowingly and willfully makes or causes to be made any false statement · or representation of a material fact in any application for any benefit or payment under a State plan approved under this subchapter, shall (i) in the case of such a statement, representation, concealment, failure, or conversion by any person in connection with the furnishing (by that person) of items or services for which payment is or may be made under this subchapter, be guilty of a felony and upon conviction thereof fined not more than $25,-000 or imprisoned for not more than five years or both * * *.

9. The Government did not introduce any evidence as to who actually prepared the claim forms involved in this case. Its theory throughout has been that Brown "caused" the false claim forms to be submitted, even if he did not prepare them himself, by dispensing a generic but making out labels (from which the claim forms were prepared) or other records indicating that a brand name had been dispensed.

10. A remittance advice is a statement issued by BCBS to a provider listing the Medicaid recipients, the drugs provided, the amounts billed by the provider, and the amounts actually reimbursed to the provider.

918 (8th Cir.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1526, 75 L.Ed.2d 948 (1983); *see Yancy,* 688 F.2d at 71; *United States v. Conzemius,* 586 F.2d 97, 99 (8th Cir. 1978), *cert. denied,* 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979). However, a conviction based on evidence that requires speculation or mere conjecture by the jury is invalid. *United States v. Richmond,* 700 F.2d 1183, 1189 (8th Cir.1983); *United States v. Knife,* 592 F.2d 472, 475 (8th Cir.1979).

■ Upon a review of the record, we think the evidence is sufficient to support the jury's verdict on counts 1–16, 23, and 48–49, but not on counts 24–47 and 50–53. The Government's theory of the case is simple, although the evidence presented was all circumstantial and somewhat confusing. The appellants assert that the Government's case required the jury to infer the requisite fraudulent intent from the mere substitution of generics. We disagree. The theory pressed at trial by the Government was that the repetitious pattern of submitting claims for brand name drugs even though generics had been dispensed demonstrated the requisite knowledge and willfulness, and that Brown's actions in filling the prescriptions and preparing the labels for the vials and the records to be kept on file caused the false claims to be submitted even if Brown himself did not actually prepare and submit the claim form in each instance.

Counts 1–12 rested on false claims arising out of an undercover investigation of the Corporation conducted by the MFD between December 12, 1982, and April 4, 1983. During this period, six investigators from the MFD posed as Medicaid recipients and had prescriptions filled at Stone's Pharmacy. On each count, the Government called the investigator who testified that Brown had filled his or her prescription. In addition, the Government introduced the claim forms submitted in each case, all of which sought reimbursement for a brand name drug, although an ASS pharmacist testified that, in each instance, the drug actually dispensed was a generic substitute

or the nonreimbursable, over-the-counter vitamin "Theragran M."

Six of these counts related to claim forms processed after the beginning of February 1983 when the Corporation obtained a computer system which automatically generated claim forms for Medicaid transactions. On these counts, the Government introduced the computer labels, which were prepared based on instructions from the dispensing pharmacist, from which the information required to prepare the claim forms was taken. Three of the labels bore the letters "XXX", which the Government alleged was a code used by the appellants to indicate generic substitutions for brand name drugs. Two other labels contained discrepancies as to the name of the drug which had been dispensed. On those two counts, the Government introduced into evidence the vial given to the Medicaid recipient from which the bottom portion of the label had been cut off, allegedly to prevent the recipient from discovering the discrepancy. All of the computer labels bore the initials "PB" or "RPB."

Counts 13–16 involved false claim forms uncovered during a "clinic" conducted by MFD agents and an ASS pharmacist on June 9, 1983. An ASS pharmacist examined the remittance advice for the Corporation for the months of March, April, and May of 1983 and identified all the drugs which had generic equivalents. MFD officials then contacted the recipients who had received any of these drugs and asked them to bring their medication to the ASS offices for inspection. At trial, the Government presented evidence that ASS pharmacists examined the drugs contained in the bottles and discovered four more instances in which the Corporation had billed for a brand name drug when a generic had actually been dispensed. Two of the labels again contained the letters "XXX," and the bottom portion of another label had again been cut off the vial. Although none of the recipients involved testified as to the identity of the dispensing pharmacist, the labels introduced into evidence bore the initials "PB" or "RPB."

On twenty-seven separate occasions between February 12, 1981, and March 7, 1983, Norma Morgan had her prescription for an over-the-counter vitamin (Geriplex) filled at Stone's Pharmacy. Counts 23–49 involved false claim forms, in which the Corporation claimed reimbursement for the brand name drug Trinsicon, submitted to BCBS in connection with these transactions. The Government introduced at trial a copy of Morgan's prescription as it had been transcribed by someone at the Corporation. That copy indicated a prescription for Trinsicon and listed the NDC number for Trinsicon. However, the "Rx" was circled, accompanied by the notation "over." On the reverse side was the inscription "(also Rx for Geriplex Caps)." Dr. Joe Verser, the prescribing physician, testified at trial that he had prescribed Geriplex, and would never have prescribed Trinsicon for Morgan. In addition, Morgan's husband testified at trial that in February 1981, when he and his wife first brought her prescription (written for Geriplex) into Stone's Pharmacy to be filled, the dispensing pharmacist, whom Morgan identified as Brown, told him that "he'd have to change the number of it or the name one. [sic] Medicare [sic] might not pay for it." Morgan testified that he told Brown he would pay for the drugs himself if Medicaid did not. When he inquired into the matter on a subsequent visit, Brown replied: "It [Medicaid] took care of it."

The Morgans' testimony only identified Brown as the dispensing pharmacist on their first visit (Count 23); the Government offered no testimony or other evidence to show who refilled the prescription on the twenty-two occasions leading to the false claim forms that form the basis of counts 24–45. The transactions underlying counts 48 and 49 were processed through the computer system.[11] On these counts, the Government introduced the computer labels which contained the initials "RPB."

In our view, the evidence presented by the Government on counts 1–16, 23, and 48–49, is sufficient to support the jury's verdict that Brown knowingly and willfully caused false claim forms to be submitted. Morgan's testimony concerning Brown's statements that he would have to change the name of the drug so Medicaid would cover it, the evidence that portions of some labels had been cut off and that other labels contained code letters, and the repetitious manner in which these false claims occurred with respect to a few specific drugs provided ample evidence from which the jury could have concluded that the claim forms were submitted with the requisite knowledge and willfulness rather than as a result of simple errors. The Government's theory that Brown caused the claim forms to be submitted by dispensing the medication and preparing the information on the labels from which the claim forms were prepared, even if he did not prepare the forms himself, is legally sufficient to satisfy the causation element of section 1396h(a)(1)(i). Eyewitness testimony established that Brown was the dispensing pharmacist on the occasions underlying counts 1–12 and 23. On counts 13–16 and 48–49, the Government introduced evidence showing the initials of the dispensing pharmacist as "PB" or "RPB." Although the Government did not directly establish that these were Brown's initials, the same initials were found on labels in several of the counts in which Brown was identified as the dispensing pharmacist. Moreover, a review of the record and transcript of the trial proceedings discloses only three other

---

**11.** Counts 23–45 involved claim forms processed manually before February 1983, when the Corporation switched to the computer system. The Government introduced no evidence at trial from which the jury could draw conclusions as to the personnel involved in the manually-processed transactions solely from documentary evidence. The only evidence introduced by the Government indicating which pharmacy personnel were involved in the manually-processed transactions was testimony from the Medicaid recipients identifying Brown as the dispensing pharmacist. It was only with the counts based on claim forms prepared after the Corporation obtained its computer system that the Government was able to do without direct eyewitness identification and rely on initials contained on the computer labels and printouts to establish the identity of the dispensing pharmacist.

pharmacists who worked at the Corporation during this time: Larry Yancy, Sherry Stone, and David Panick. Thus, the jury could reasonably have concluded that Brown also filled the prescriptions in these six counts.

The evidence introduced by the Government is not sufficient, however, to support Brown's conviction on counts 24–47 and 50–53. Counts 24–45 involved manually-prepared claim forms. As noted above, the Morgans' testimony indicated only that Brown had been the dispensing pharmacist on the occasion underlying count 23 and the Government did not introduce any other evidence from which the jury could reasonably have concluded that Brown was the dispensing pharmacist on any of the occasions underlying counts 24–45.[12] Thus, although Brown may very well have been the dispensing pharmacist on some or all of these occasions, the Government adduced no evidence to that effect but merely invited the jury to speculate that because he filled the initial Morgan prescription and some of the others charged in the indictment, he probably filled the prescriptions and prepared the labels on these occasions too. That evidence, in our view, is just too attenuated, conjectural, or speculative to support the jury's verdict on those counts. *See Richmond,* 700 F.2d at 1189; *Knife,* 592 F.2d at 475.

The transactions in counts 46–47, also involving false claim forms submitted in connection with refills of the Morgan prescription, were processed on the computer. Although the Government offered no testimony as to who the dispensing pharmacist was on either occasion, the computer labels introduced into evidence on these two counts bore the initials "LY." Consequently, the Government presented no evidence on these two counts from which the jury could reasonably have concluded that Brown was the dispensing pharmacist or that he otherwise caused the false claim forms to be submitted on these occasions.

Counts 50–53 involved claim forms submitted for medication . dispensed to Roosevelt Coombs. On four occasions, Coombs received a nonreimbursable vitamin supplement (Clusivol), but the Corporation billed Medicaid for Trinsicon. Coombs' prescription, as originally written, was for Clusivol. On the Corporation's copy of the prescription, however, "Clusivol" had been scratched out, accompanied by the notation "not covered by Medicaid," and the NDC number for Trinsicon had been written in. As with counts 24–47, however, the Government did not present evidence, either in the form of testimony identifying Brown as the dispensing pharmacist or labels containing Brown's initials, from which the jury could reasonably have found that Brown was involved in filling the prescription, preparing a copy of the prescription for file, or preparing the claim forms on any of these four occasions. Here, too, the evidence required speculation on the part of the jury as to Brown's involvement and, consequently, his conviction on these four counts cannot stand.

 This analysis of the evidence applies equally to the Corporation's conviction.[13]

---

**12.** This, of course, was not the only theory upon which the Government could have proceeded against Brown. It might, for example, have pursued a theory alleging that even if Brown did not actually fill a particular prescription and prepare the records, he supervised or oversaw the dispensing of all drugs or exercised total control over the operation of the pharmacy such that he could be held responsible for the acts of other pharmacy personnel. Nonetheless, it did not introduce any evidence detailing the operations or procedures followed at Stone's Pharmacy or demonstrating the degree of control exercised by Brown over the operation of the business. The Government does talk about a code in its brief and the suspicion that the appellants employed some type of code to identify generic substitutions led to the decision to conduct the June 7 inspection. The Government did not, however, develop this theory at trial. Consequently, because the Government chose simply to proceed at trial under the theory that Brown caused the false claims to be submitted by filling a prescription and preparing the label, the evidence it presented must be assessed in that light.

**13.** The Corporation does stand in a somewhat different legal position than Brown in view of the statutory language of section 1396h(a)(1)(i). That section applies to "[w]hoever—(1) knowingly and willfully makes or causes to be made

There is no question but that the Corporation submitted false claims as alleged in each count of the indictment; the Government's evidence clearly demonstrated that. That showing, however, is not enough. The Government also had to prove that the false claims were knowingly and willfully submitted. Because the corporate entity itself does not possess any volitional capacity, the requisite knowledge and willfulness exists only if it is attributable to the Corporation through the acts of its agents. Because we have* held that the evidence presented by the Government was sufficient to support the jury's verdict that Brown, an agent of the Corporation, acted with the requisite knowledge and willfulness on counts 1–16, 23, and 48–49, that knowledge and willfulness may be attributed to the Corporation. Accordingly, the evidence presented by the Government is sufficient to support the conviction of the Corporation on those counts. However, the Government's evidence is insufficient to establish the requisite knowledge and willfulness on the part of the Corporation in the transactions underlying counts 24–47 and 50–53. Indeed, the Government produced no evidence whatsoever as to the identity of the employees who participated in the transactions underlying counts 24–45 and 50–53 or as to the conduct of Paul Brown, president of the Corporation, or any corporate supervisor relating to those counts. Thus, even though the Government introduced sufficient evidence on these counts to establish that the Corporation submitted false claim forms, no evidence exists upon which the jury could have found the requisite volitional state which could be attributed to the Corporation. Consequently, the conviction of the Corporation on counts 24–47 and 50–53 also cannot stand.

**C. Materiality of False Statement Counts.**

Section 1396h(a)(1) requires the "false statement or representation of a material fact." Appellants cite *Blake v. United States*, 323 F.2d 245, 246 (8th Cir.1963), in which this court defined "materiality" in terms of "whether [the statement] 'has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made'" and assert that the false statements in counts 1–12 (claims resulting from the undercover investigation) were not material because BCBS paid these claims with knowledge that the information was incorrect. Consequently, according to the appellants, the false claim forms could not have had the tendency or capability of influencing BCBS's decision to pay.

We disagree. Materiality is a question of law, *see United States v. Holecek*, 739 F.2d 331, 337 (8th Cir.1984); *United States v. Adler*, 623 F.2d 1287, 1292 (8th Cir.1980), and we have held that a statement is material if it is necessary "to put the claimant in a position to receive government benefits, whether rightfully or wrongfully." *Adler*, 623 F.2d at 1291. Materiality does not require actual reliance by the government on the statement. *United States v. Richmond*, 700 F.2d 1183, 1188–89 (8th Cir. 1983); *United States v. Cowden*, 677 F.2d 417, 419 (8th Cir.1982); *see Holecek*, 739 F.2d at 337 (quoting *United States v. Greenberg*, 735 F.2d 29, 31 (2d Cir.1984)).

■ An ASS pharmacist testified at trial that BCBS paid out claims on the basis of price information coded to the NDC number, unless the amount listed by the provider in the total amount billed column was less, in which case BCBS paid that amount.[14] In each count of the indictment,

any false statement * * *." In this case, the Corporation is the provider, and, consequently, is the entity that actually "made" the false statements. Brown, the president of the Corporation, did not actually make the false statements alleged in the indictment but, according to the Government, he caused them to be made. Nonetheless, the different relative positions of Brown and the Corporation under the statute do

not compel a different result in view of the evidence presented by the Government.

14. The claim forms require the provider to include the prescription number, the name and identification number of the prescribing physician, the date of the prescription and date the prescription was filled, the NDC number and quantity of the drug supplied (the NDC number

the Government established that the claim form listed an NDC number for a brand name drug when a generic or over-the-counter vitamin had been dispensed. Submission of a claim for reimbursement for drugs dispensed which does not accurately reflect the drugs dispensed constitutes a misrepresentation of a material fact because it put the Corporation in the position to receive government benefits it had no rightful claim to receive.

Appellants contend, however, that even if the claim forms did misrepresent the drug actually dispensed, the Government did not prove that that misrepresentation was material because it presented no testimony establishing that the generics dispensed were cheaper than the brands claimed or that the Corporation received reimbursement for an amount in excess of that to which it was entitled. We disagree. It is well-known that generics are cheaper than the equivalent brand name product; indeed, that is the very reason that ASS encouraged providers to substitute generics whenever possible. A BCBS pharmacist testified that, within her experience, every generic drug was significantly less expensive than the brand name drug. She was unable to establish the actual difference in price in each count of the indictment only because she was unable to determine the manufacturer of some of the generics dispensed and each generic had a different price. We hold, as a matter of law, that the false statements in each count contained a misrepresentation of material fact. Thus, appellants are entitled to no relief on this ground.

The appellants raise numerous other points of error. We have carefully examined each of these arguments and conclude that all of them are without merit.

is an identification number given to a drug when it is released on the market), and the total amount billed.

15. The court fined Brown $10,000 on count 1, and suspended imposition of sentence on count 2, placing Brown on probation for 36 months with a special condition that he perform specified community service for a period of six

### III. CONCLUSION.

We affirm the convictions of both Brown and Stone's Pharmacy on counts 1–16, 23, and 48–49, but vacate the convictions on counts 24–47 and 50–53. The judgment of the district court is modified accordingly. The vacation of the convictions on these counts does not affect the sentence.[15]

months. The court also suspended imposition of sentence on counts 3–16 and 23–53, with the 36-month probationary period on each to run concurrent with that on count 2. The court fined the Corporation $5,000 on each count, but made the fines on counts 2–16 and 23–53 concurrent with the fine on count 1, for a total fine of $5,000.